NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JOHN N., | ) | |
| | ) | Supreme Court No. S-14578 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-09-10120 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| DESIREE N., | ) | AND JUDGMENT[*] |
| | ) | |
| Appellee. | ) | No. 1460 – May 8, 2013 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Peter A. Michalski, Judge.

Appearances: Jody W. Sutherland, Law Offices of Jody W. Sutherland, Anchorage, for Appellant. Wayne Anthony Ross, Ross & Miner, P.C., Anchorage, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

I.    INTRODUCTION

John N.[1] appeals a superior court order granting Desiree N. sole legal and primary physical custody of their daughter Julia. We vacate the order and remand to the

---

[*]    Entered under Appellate Rule 214.

[1]    To protect the family's privacy, we use an initial instead of their full last name.

superior court for a more thorough consideration of the significant issue of Desiree's mental health and a reconsideration of the relevant statutory best interests factors.

## II.   FACTS & PROCEEDINGS

John and Desiree N. met on the internet and married in 2004 in the Philippines. John, who lived in Alaska, made periodic trips to visit Desiree until August 2006, when she joined him in the United States. Their daughter Julia was born in September of that year.

John and Desiree moved onto separate floors of their house in the summer of 2009. John instigated the separation, testifying at trial that it was because of Desiree's irrational behavior. In September 2009 John filed for divorce.

In October 2009 Desiree vandalized the couple's home, destroying some of John's clothes, moving furniture and other possessions, and writing "ugly" in big letters across the walls. She told John that someone had broken into the house, and he called the police. Desiree initially told the responding officer that Julia had caused the damage, but she later admitted that she had done it herself because she was upset with John about the divorce. The next day John obtained a restraining order against her. After a domestic violence hearing, the court issued a long-term protective order and restricted Desiree to supervised visitation until such time as she had "received a psychological examination and obtained a hearing at which the court can review the opinion of the doctor regarding the relative safety of the mother to act as mother to the child."

In March 2010, at the end of a supervised visit, John called the police to report that Desiree was trying to take Julia away with her. Desiree was arrested for violating the protective order, though the charges were later dropped.

A court-ordered custody investigation was completed in April 2011. The investigator highlighted Desiree's continuing mental health issues and made the interim recommendation that John retain primary physical custody of their daughter.

In December 2011 the superior court took evidence on the child custody issues. The court concluded that the best interests of the child favored Desiree. The court granted Desiree sole legal custody and primary physical custody, with the schedule of John's visits depending on whether he completed a planned move to Virginia.

John appeals. He challenges the superior court's assessment of the best interests factors, particularly as they concern Desiree's mental health, the child's need for stability and continuity, and each parent's willingness to allow a close and continuing relationship with the other parent.

## III.    STANDARD OF REVIEW

"We reverse a trial court's custody determination if the court's critical factual findings were clearly erroneous or if we find that the trial court abused its discretion."[2]  "The superior court's factual findings are clearly erroneous if, after a review of the entire record, we are left with the definite impression that a mistake has been made."[3]  "We will grant especially great deference when the trial court's factual findings require weighing the credibility of witnesses and conflicting oral testimony."[4]  "We will find that the trial court abused its discretion if it has considered improper

---

[2]    *Schmitz v. Schmitz*, 88 P.3d 1116, 1121-22 (Alaska 2004) (citing *West v. West*, 21 P.3d 838, 841 (Alaska 2001)).

[3]    *Thomas v. Thomas*, 171 P.3d 98, 102 (Alaska 2007) (citing *Fardig v. Fardig*, 56 P.3d 9, 11 (Alaska 2002)).

[4]    *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 178 (Alaska 2009).

factors, failed to consider relevant statutory factors, or assigned disproportionate weight to some factors while ignoring others."[5]

## IV. DISCUSSION

### A. It Was An Abuse of Discretion Not To Thoroughly Consider And Resolve The Significant Issue Of Desiree's Mental Health.

"The trial court must base custody determinations upon the child's best interests, using the factors listed in AS 25.24.150(c)."[6] "The court may consider other

---

[5]      *Schmitz*, 88 P.3d at 1121 (citing *West*, 21 P.3d at 841).

[6]      *Id.* at 1122. AS 25.24.150(c) provides that

[i]n determining the best interests of the child the court shall consider

(1)     the physical, emotional, mental, religious, and social needs of the child;

(2)     the capability and desire of each parent to meet these needs;

(3)     the child's preference if the child is of sufficient age and capacity to form a preference;

(4)     the love and affection existing between the child and each parent;

(5)     the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;

(6)     the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child, except that the court may not consider this willingness and ability if one parent shows that the other parent has sexually assaulted or engaged in domestic violence against the parent or the child, and that a

(continued...)

factors not listed in the statute if those additional considerations are relevant to the child's best interests."[7]  "The mental health of a parent is a proper topic of inquiry at a custody hearing; however, the basis of the custody determination is the best interests of the child and a parent's conduct is relevant only insofar as it has or can be expected to negatively affect the child."[8]  John argues that the superior court did not adequately address concerns that had been raised about Desiree's mental health.  Given the seriousness and recurrence of those concerns, we agree.

The domestic violence hearing in November 2009 was before the same judge who presided over the couple's divorce.  During the hearing, at which Desiree appeared pro se, the court expressed concern about her behavior and urged her to have a psychological evaluation.  The court found that Desiree "does represent a credible threat at this point to safety because of the anger that she has" and that a long-term

---

[6](...continued)
> continuing relationship with the other parent will endanger the health or safety of either the parent or the child;
>
> (7)     any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents;
>
> (8)     evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child;
>
> (9)     other factors that the court considers pertinent.

[7]     *Schmitz*, 88 P.3d at 1122-23.

[8]     *Morel v. Morel*, 647 P.2d 605, 608 (Alaska 1982) (citing *Craig v. McBride*, 639 P.2d 303, 306 (Alaska 1982); *Bonjour v. Bonjour*, 566 P.2d 667, 669 (Alaska 1977); *Horutz v. Horutz*, 560 P.2d 397, 401 (Alaska 1977)); *see also Lowdermilk v. Lowdermilk*, 825 P.2d 874, 879 (Alaska 1992) (citing *Morel*, 647 P.2d at 608) ("[T]here must be a nexus between mental state and parenting ability for it to be a proper consideration.").

protective order was justified, though the court also observed that Desiree was perhaps reacting to the sudden change in her circumstances and her husband's treatment of her. The court stated that it was "a good idea" for Desiree to have a psychological or psychiatric examination, and "if the doctor says she was upset, it was a temporary upset, . . . she's [not] going to . . . hurt this baby, she loves the baby," only then would she be allowed unsupervised visitation. The resulting protective order accordingly restricted Desiree to supervised visitation until she "received a psychological examination and obtained a hearing at which the court [could] review the opinion of the doctor regarding the relative safety of the mother to act as mother to the child."

In February 2010 a psychologist wrote to inform the court that he had conducted a psychological assessment of Desiree and that based on some positive indicators, summarized briefly in the letter, he recommended that Desiree be provided with an "expanded level of visitation with her daughter." But the psychologist's letter did not attach a report of the psychological assessment, which apparently included a mental status exam, an oral assessment, a brief anger assessment, and a parenting inventory. And at two successive interim hearings, Desiree was unable to produce for cross-examination the psychologist who had conducted the evaluation, and the court therefore never received the report or acted on it while the protective order was in force. In December 2010 John asked that the protective order not be extended, and the court granted his request.

In the meantime, in March 2010, Desiree obtained an attorney, and she continued to be represented for the remainder of the custody proceedings. Her attorney raised his own concerns about his client's mental health, concerns which stemmed in part from Desiree's stated belief that Julia had been "switched" and was not her biological

child.[9]  In September 2010 the court ordered a maternity test in response to Desiree's fears (the test apparently confirmed her maternity, though the results are not in the record).  In a November 2010 cross-motion for interim relief, Desiree's attorney stated that "it is clear that Desiree will need counseling" and requested "at least $5000 to allow an evaluation of Desiree, and any necessary followup counseling."  But the court did not rule on Desiree's motion, and her attorney later pointed out in Desiree's trial brief that the lack of money for counseling "precluded Desiree from presenting any professional evidence" regarding her mental health at trial.

In a February 2011 affidavit accompanying a motion to continue trial, Desiree's attorney took the extraordinary step of informing the court that, without money for counseling, Desiree was "operating with an impaired capacity as to certain aspects of this case" and that her condition had "continued, if not deteriorated" since his first request for counseling fees.  Citing Alaska Rules of Professional Conduct 1.14(b) and 3.3,[10] the attorney expressed his opinion that both Desiree and Julia were "at risk of

---

[9]     One of the visitation supervisors testified at trial that Desiree told Julia on a number of occasions that the girl was not her child.

[10]     Rule 3.3 concerns the lawyer's duty of candor towards the tribunal.  Rule 1.14(b) provides:

> When the lawyer reasonably believes that the client has impaired capacity, that the client is at risk of substantial physical, financial, or other harm unless action is taken, and that the client cannot adequately act in the client's own interest, the lawyer may take reasonably necessary protective action, including consulting with individuals or entities that have the ability to take action to protect the client and, in appropriate cases, seeking the appointment of a guardian ad litem, conservator or guardian.

substantial harm" if the court proceeded with the custody trial before Desiree received counseling.

The court granted a continuance and, on the same day, ordered the custody investigator "to perform a limited, brief review of the best interests of the child."  The custody investigator, Greg Galanos, concluded in his April 2011 report that Desiree's "mental health remains a concern that her visit to a counselor did not ease" (apparently referencing the psychological evaluation she had received in February 2010).  Included in Galanos's report was information he had received from Laurel Searcy, a licensed professional counselor who had been working with Julia since John and Desiree's separation.  Searcy reported that Desiree "says many inappropriate things to [Julia]" and that being away from her father made Julia anxious.  According to Searcy, John and Julia had an "appropriate, healthy, loving father-daughter relationship" but "further communication or visitation between Julia and her mother is more harmful [than] is helpful at this point."  Galanos recommended that John continue to have primary physical custody of Julia and that Desiree "have a psychological evaluation with the evaluator being informed about the concerns raised regarding Mother."

Desiree apparently had no further mental health evaluations or counseling before trial in December 2011.  At trial Searcy testified at length about Desiree's troubling conduct, including making disparaging comments about John, telling Julia that John was seeing other women, and telling Julia that John was going to die.  Searcy testified that these comments caused Julia anxiety, confusion, and nightmares.  Searcy also testified that Julia related scary dreams in which her mother killed her.  Two visitation supervisors testified about remarks Desiree made to Julia about John, including that one of the supervisors was carrying John's child, that John was "bad and evil," and that he was sexually assaulting Julia.

In its written order following the custody trial, the superior court addressed Desiree's mental health in the context of its discussion of AS 25.24.150(c)(2), "the capability and desire of each parent to meet [the needs of the child]." The court observed that Desiree had suffered "something of an emotional breakdown during which [she] cut up the father's clothes and wrote on the walls and blamed those acts on others" and that these acts "caused the issuance of the domestic violence order." The court attributed this breakdown to "[t]he father's treatment of the mother." The court found that these past actions "resulted in her being evaluated by both military mental health personnel and community health providers," but that "[n]either evaluation identified any serious mental health condition and no evidence has been submitted establishing any expert opinion verifying such a condition."

We observe, however, that neither of the evaluations cited by the court had been admitted at trial as evidence of Desiree's mental health. One of them, completed by Air Force providers in December 2009 for purposes of a work clearance, was marked as one of Desiree's trial exhibits but never moved into evidence. The second evaluation was completed by a psychologist in February 2010, but John objected to it on hearsay grounds because its author was not available to testify at trial, and the court admitted it for the limited purpose of placing into context John's failure to change his position on visitation. The court expressly refused to admit this second evaluation as evidence of Desiree's mental health. Further, each of the evaluations is less than a page long. Both of them had been completed nearly two years before trial, before concerns were raised about Desiree's belief that Julia had been "switched" with another child, and almost a year before Desiree's own attorney voiced his concerns that his client's mental health problems were continuing or deteriorating, to the possible detriment of the child.

The superior court's discussion of the issue nonetheless implies that it found concerns about Desiree's mental health to be unsubstantiated or overstated. But in the context of this record, the court's reliance on the *absence* of a negative mental health evaluation was not an adequate resolution of the issue. The same judge had found two years earlier that the mother posed a risk of harm to her child and should not have unsupervised visitation absent a positive psychological examination; the mother's own attorney had felt compelled by his ethical duties to inform the court that his client's mental health remained an issue and posed a potential risk of harm to the child; a court-ordered custody investigation had resulted in the recommendation that custody remain with the father and that the mother receive counseling for her unresolved mental health problems; and there was substantial evidence at trial that the mother's mental health issues were serious and unresolved and that they caused her to act and speak inappropriately, with resulting harm to the child.[11]

The history of this case and the evidence at trial placed the issue of Desiree's mental health squarely in dispute. It was therefore incumbent on the superior court to address and resolve the controversy in its findings so that its decision of the issue could be meaningfully reviewed.[12] The superior court did not do so here, and it abused its discretion in dismissing the issue on the basis of dated psychological evaluations that

---

[11]     We do not mean to imply that any one of these facts required the trial court to reach a different conclusion about Desiree's mental health. For example, we have consistently held that the trial court is not obliged to accept the recommendations of a custody investigator, *see, e.g., Chase v. Chase*, 109 P.3d 942, 945-46 (Alaska 2005), and we give "especially great deference" to the trial court when its factual findings "require weighing the credibility of witnesses and conflicting oral testimony." *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 178 (Alaska 2009).

[12]     *See Thomas v. Thomas*, 171 P.3d 98, 106-07 (Alaska 2007).

were not properly before it. In order to ensure meaningful appellate review, the superior court on remand should make additional findings of fact on the issue of Desiree's mental health and its impact on the child.

### B. It Was An Abuse of Discretion Not To Thoroughly Consider The "Close And Continuing Relationship" Factor.

Alaska Statute 25.24.150(c)(6) also requires the trial court to consider "the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child." The superior court found that this best interests factor tilted in Desiree's favor because "the entire case has revolved around the father's effort to get the mother out of the child's life." John argues that the superior court abused its discretion in weighing this factor so heavily against him, given that his actions in restricting Desiree's contact with their daughter were in compliance with the court's own protective order. John's argument has merit.

At the November 2009 domestic violence hearing, the court found that a crime of domestic violence had occurred and that Desiree presented a credible threat to the safety of others because of her anger. It is clear from the custody decision in 2011 that by that time the court had come to view John's earlier pursuit of the protective order as manipulative and perhaps an overreach. This was certainly a possible conclusion from the evidence.[13] Yet the superior court did not explain why it reached that conclusion, one that is seriously at odds with its view of the evidence following the domestic violence hearing. Indeed, the superior court acknowledged in its custody decision that John's

---

[13] The superior court noted the parents' "relative physical condition" as reason to doubt that John could have been in fear of Desiree at the time he sought the protective order. But the court's comments at the hearing on the long-term order, as well as the written order itself, reflect the court's concern that Desiree posed a risk of harm at least to her daughter if not to John.

fears for his daughter's safety were "possibly real in his mind." Parties should not be faulted for their compliance with court orders without a reasoned explanation as to why they should be. Given the prominent role this issue played in the superior court's decision, and to ensure effective appellate review, the superior court on remand should revisit this issue and make findings sufficient to explain any significant change in the court's perspective between one hearing and the next.

**C.** **It Was An Abuse of Discretion to Consider John's Marital History Absent Evidence That It Would Impact The Child.**

Finally, AS 25.24.150(c)(5) requires the court to consider "the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity." In concluding that Desiree was better able to provide Julia with stability and continuity, the superior court relied in part on a finding that John "does not seem to be able to maintain relationships, this being his sixth divorce." John argues that his marital history has no bearing on his ability to have a stable and satisfactory relationship with his daughter.

"[W]hile a parent's past is not determinative, it can be considered in evaluating current stability and parenting ability."[14] Yet " 'evidence of the lifestyle, habits, or character of a custody claimant is relevant only to the extent that it may be shown to affect the person's relationship to the child.' "[15] In *Craig v. McBride*, we found the superior court's "reference to the fact that the mother had . . . demonstrated an

---

[14] *McDanold v. McDanold*, 718 P.2d 467, 470 (Alaska 1986) (citing *Craig v. McBride*, 639 P.2d 303, 305 n.7 (Alaska 1982)).

[15] *Craig*, 639 P.2d at 306 (quoting *Britt v. Britt*, 567 P.2d 308, 311 (Alaska 1977), *overruled on other grounds by Evans v. McTaggart*, 88 P.3d 1078 (Alaska 2004)). *See also Rego v. Rego*, 259 P.3d 447, 460-61 (Alaska 2011).

instability in terms of relationships" to be "improper" because the record presented only "scant evidence" that the mother's conduct had adversely affected the child.[16]

The same is true here. The superior court did not explain how John's marital history would adversely impact his relationship with Julia, and there is little evidence in the record to suggest that it would.[17] The superior court on remand should not rely on John's prior marriages absent evidence that they could adversely affect the best interests of the child.

## V. CONCLUSION

We VACATE the custody order and REMAND for further consideration of the relevant best interests factors, particularly the issue of Desiree's mental health and how it may affect the child. The superior court's decision should be made on the facts as they currently exist, which likely will require the taking of additional evidence.[18] Given the circumstances of the case, we urge the superior court to take up the matter on an expedited basis.

---

[16]     *Craig*, 639 P.2d at 305-06.

[17]     Desiree refers in her brief to "testimony from [John] that he has maintained scant contact with his children from his previous marriages." John testified that he has a grown son who now lives in Washington, D.C., but he did not provide any testimony about the particulars of this relationship. He testified that he also had a daughter, born while he was stationed in Okinawa, that he had lost contact with her mother, and that he had only recently discovered where the daughter was living. None of this testimony appears to bear directly on John's ability to have a stable relationship with Julia.

[18]     *See Smith v. Weekley*, 73 P.3d 1219, 1227 (Alaska 2003) (remanding for a new statutory best interests determination "based on all of the currently available evidence" and stating that "[u]pon remand, the parties should be allowed to present updated evidence to the court.").