896 P.2d 240 (1995)
A.H., Appellant,
v.
W.P., Appellee.
No. S-5683.
Supreme Court of Alaska.
June 9, 1995.
*241 A.H., pro se, Alva, OK.
Andrew J. Fierro, Kemppel, Huffman and Ginder, Anchorage, for appellee.
Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

OPINION
COMPTON, Justice.

I. INTRODUCTION

A.H. appeals numerous rulings made during the course of custody litigation with her ex-husband, W.P., over their son, C.P. A.H. is suffering from an undiagnosed mental impairment that had its onset after she was awarded custody of C.P. in 1988. Since then, according to the trial court, A.H.'s actions indicate "a significant disturbance in her overall cognitive and emotional functioning." Her behavior led W.P. to seek custody of C.P. Since the initiation of the custody modification proceedings, A.H. has taken C.P. out of Alaska twice without notice to the court or W.P. as to her plans or whereabouts. The second of these episodes violated a court order that required C.P. to be kept within the Third Judicial District of Alaska.
The superior court concluded that A.H.'s impaired mental functioning represented a substantial change of circumstances. After reassessing the best interests of C.P., the superior court awarded his exclusive physical custody to W.P., and ordered A.H. to pay child support.
A.H. appeals from these rulings on numerous grounds.

II. FACTS AND PROCEEDINGS

A.H. and W.P. were married in 1977, and in 1982 had a son, C.P. In early 1988 the couple was divorced. A.H. obtained sole legal and primary physical custody of C.P., with W.P. paying child support and receiving several weeks of visitation each year. For the two years following the divorce, W.P. was able to complete visitation with C.P., even though C.P. was living with A.H. in Oklahoma.
However, during this period and the following years A.H. began to exhibit strange behavior. She began therapy for an undiagnosed mental illness, but did not complete the treatment. In late 1989 A.H. contacted W.P. and told him that people were after her and C.P. After A.H. and C.P. fled by car from Oklahoma to Dallas, Texas in the middle of the night, W.P. brought C.P. to Alaska with A.H.'s apparent consent. A.H. followed within weeks. W.P., A.H., and C.P. resided together in Anchorage from January to September 1990. A.H. and C.P. then obtained other accommodations in Anchorage, but eventually relocated to Girdwood in June 1991.
A.H.'s strange behavior continued. She withdrew C.P. from the school, alleging that he was undergoing physical and mental abuse in the school, and that people were attempting to kidnap him. Additionally, it is alleged that she contacted the Alaska State *242 Troopers to report a one-month-old fetus in her refrigerator.[1]
Between 1989 and 1992, W.P. alleges that A.H. and C.P. resided in four different cities, and C.P. attended four to six different schools. W.P. also maintains that faculty members at one school noted behavioral changes and instability in C.P., developments they attributed to A.H.'s behavior. W.P. further asserts that during this period, A.H. had worked for a number of employers, and filed lawsuits or grievances against several of them.
During the summer of 1991, W.P. alleges that A.H. prevented his visitation with C.P. that had been scheduled in accordance with the terms of the dissolution decree. This, combined with W.P.'s observations of A.H.'s "bizarre behavior," led him to petition unsuccessfully for A.H.'s involuntary institutional commitment in early 1992.
In May 1992 W.P. filed a motion to show cause why A.H. should not be held in contempt for her non-compliance with the visitation provisions of the parties' dissolution decree. The parties' attorneys signed on behalf of their clients a stipulation relating to summer visitation arrangements. Accordingly, W.P. took physical custody of C.P. on June 29. A.H. removed C.P. from W.P.'s custody after approximately three weeks. In the interim, W.P. claims that A.H. was obsessive about maintaining an abnormally high degree of contact with C.P. W.P. states that A.H. insisted on making an inordinate number of phone calls to C.P. and contacted the police on two occasions, on one because she was unable to talk with C.P. as he was at a cabin without a phone, and on another to allege that C.P. required medical treatment.
W.P.'s motion for order to show cause was heard in late July. W.P. also filed additional motions, one seeking to have a mental evaluation performed on A.H. and another to obtain interim custody of C.P. The court permitted A.H. to withdraw the June stipulation. Nevertheless, the court held, inter alia, that (1) the dissolution decree provisions regarding visitation were to be enforced, (2) A.H.'s allegations that W.P. abused their son were unfounded, (3) A.H.'s excessive need for contact with C.P. was not in C.P.'s best interests, and (4) in the future, A.H. was to limit her phone calls to C.P. to three, fifteen-minute calls weekly.
At August and September hearings, the court ordered that A.H. undergo a psychological evaluation. The court delayed ruling on the change of custody until the evaluation was available. In September, before the scheduled evaluation appointment, A.H. fled the state with C.P., without notice to the court or W.P. W.P. then filed an expedited motion for interim custody, which was granted in mid-September.
The authorities located A.H. and C.P. in Oklahoma. In October, proceedings were held in the Oklahoma District Court. The judge held that the court did not have final jurisdiction over the custody determination, and expressed deep concern that C.P. had undergone stress because of A.H.'s irresponsible actions. The court gave W.P. immediate, temporary custody of the child. W.P. and C.P. returned to Alaska, and A.H. soon followed.
After her arrival, A.H. forced herself into C.P.'s classroom at school in order to contact him in-person. In response, W.P. obtained a restraining order that prevented A.H. from having unsupervised physical contact with C.P. or any contact at his school. The court also granted W.P. temporary custody of C.P.
Hearings were held in October. Despite an order that no one was to discuss the case with C.P. besides the psychologist he was seeing, A.H. was observed coaching C.P. about his testimony. The court also had *243 ordered that C.P. was not to be removed from the Third Judicial District, and that A.H. was to be permitted supervised visitation. Nevertheless, in late November A.H. successfully abducted C.P. during a supervised visitation session and fled Alaska.
An arrest warrant was issued for A.H. In early December, and in A.H.'s absence, the court awarded W.P. interim child support of $300 per month. The court based the award on A.H.'s estimated ability to earn $1,500 per month. Additionally, the court ordered A.H. to pay one-half of the monthly cost of having her visitation supervised, or $400.
In January 1993 the authorities located A.H. and C.P. in Washington State. A.H. was taken into custody pending her extradition to Alaska. W.P. went to Washington and brought C.P. back to Alaska. A.H. was eventually charged with Custodial Interference in the First Degree, and a trial date on the charge was set for April.
The change of custody hearing was held in March. After two days of hearings involving the testimony of medical professionals, the court entered findings of fact and conclusions of law. The court held that there clearly had been a change in circumstances since the entry of the custody order. The court specifically discussed several instances of A.H.'s unconventional conduct, and concluded that "there has been a significant disturbance in A.H.'s overall cognitive and emotional functioning." Therefore, the court determined that A.H.'s
bizarre behavior ... is contrary to [C.P.'s] best interests... . At the very least, this behavior is embarrassing to [C.P.], and he is presently at a very vulnerable age and for this conduct to persist can only place him in graver jeopardy... . The evidence further demonstrates that [A.H.] is not reliable. Whether she is having this difficulty due to a brain injury or mental illness, it leads me to the conclusion that she is not presently able to safely care for [C.P.]
The court also concluded that, "There is no credible evidence that [W.P.] is not an appropriate custodian, and it does appear that it is in [C.P.'s] best interests to be in [W.P.'s] sole care, custody, and control." Furthermore, the court opined that A.H.'s visitation with C.P. "is extremely problematic" and presented the risk that she might abscond with the child again, a possibility the court found "extremely likely." Therefore, the court ordered that once A.H. was no longer incarcerated,[2] she could not have visitation or contact with C.P. "absent a court order approving a system of security to keep [A.H.] from removing [C.P.] from his placement with his father." Finally, without additional comment, the court ordered A.H. to continue to pay child support in accordance with the court's earlier order.
A.H. appeals from these rulings.

III. DISCUSSION

A. Issues Waived Due to Inadequate Briefing

A.H. is proceeding pro se. The quality of her briefing greatly impairs any viable arguments she may have, as well as this court's ability to deal with the issues presented. A.H. presents arguments that may have validity. However, the majority of the fifty-six issues she raises are waived due to inadequate briefing. Throughout most of the briefs A.H. provides no citation of legal authority, and in the vast majority of instances her arguments are cursory and undeveloped. "[W]here a point is given only cursory statement in the argument portion of a brief, the point will not be considered on appeal." Adamson v. University of Alaska, 819 P.2d 886, 889 n. 3 (Alaska 1991); see also Wren v. State, 577 P.2d 235, 237 n. 2 (Alaska 1978) (issue waived due to failure to list in points of appeal and inadequate briefing). Accordingly, this court has held that superficial briefing and the lack of citations to any authority constitutes abandonment of the point on appeal. Wernberg v. Matanuska Elec. Ass'n, 494 P.2d 790, 794 (Alaska 1972); see also Forquer v. State, Commercial Fisheries Entry Comm'n, 677 P.2d 1236, 1238 n. 2 (Alaska *244 1984) (issue waived because appellants failed to develop their arguments adequately and the record to extent necessary for court adequately to address an issue); Fairview Dev., Inc. v. City of Fairbanks, 475 P.2d 35, 36 (Alaska 1970) ("single conclusory paragraph without citation of any authority ... is not adequate to put the issue before the court"), appeal dismissed and cert. denied, 402 U.S. 901, 91 S.Ct. 1374, 28 L.Ed.2d 642 (1971).
Addressed below are A.H.'s claims which are developed and supported by the necessary authority.

B. Changed Circumstances and Best Interests of the Child as a Basis for Awarding Custody to W.P.

A child custody or visitation award "may be modified if the court determines that a change in circumstances requires the modification of the award and the modification is in the best interests" of the children involved. AS 25.20.110. The parent making the motion for custody modification bears the burden of proving a substantial change of circumstances as a threshold matter. Lee v. Cox, 790 P.2d 1359, 1361 (Alaska 1990); Garding v. Garding, 767 P.2d 183, 184-85 (Alaska 1989). Once the movant meets that burden, he or she is entitled "to a hearing to consider whether, in light of such changed circumstances, it is in the child's best interest to alter the existing custodial arrangement." Lee, 790 P.2d at 1361. The burden of proof remains on the parent making the motion to "demonstrate that the changed circumstances, considered in conjunction with other relevant facts bearing upon the child's best interests, warrant modification of the existing custody decree." Id.

We will reverse the trial court's order to modify custody only if "the record shows an abuse of discretion or if controlling factual findings are clearly erroneous." McClain v. McClain, 716 P.2d 381, 384 (Alaska 1986); Gratrix v. Gratrix, 652 P.2d 76, 79-80 (Alaska 1982). Abuse of discretion in child custody cases may occur when, in reaching its decision, the trial court considers improper factors, fails to consider statutorily mandated factors, or gives too much weight to some factors. S.N.E. v. R.L.B., 699 P.2d 875, 878 (Alaska 1985); Starkweather v. Curritt, 636 P.2d 1181, 1182-83 (Alaska 1981); Deivert v. Oseira, 628 P.2d 575, 577 (Alaska 1981).
Long v. Long, 816 P.2d 145, 150 (Alaska 1991).
In the sections of her brief in which A.H. deals with changed circumstances and the best interests of the child, the only[3] claim she adequately briefs is her argument that the trial court, in finding changed circumstances that justified reassessment of C.P.'s best interests, see Long v. Long, 816 P.2d 145, 150 (Alaska 1991) (interpreting AS 25.20.110), impermissibly relied upon a social stigma related to A.H.'s handicap.[4]
In support of this assertion, A.H. cites S.N.E. v. R.L.B., 699 P.2d 875 (Alaska 1985). In S.N.E., this court did hold that
[c]onsideration of a parent's conduct is appropriate only when the evidence supports a finding that a parent's conduct has or reasonably will have an adverse impact on the child and his best interests.
Id. at 879.
Of greater relevance to this case is our decision in Morel v. Morel, 647 P.2d 605 (Alaska 1982). In Morel we stated:
The mental health of a parent is a proper topic of inquiry at a custody hearing; however, the basis of custody determination is *245 the best interests of the child and a parent's conduct is relevant only insofar as it has or can be expected to negatively affect the child.
Id. at 608.
Both S.N.E. and Morel support the trial court's ruling on this issue. The trial court did not comment or rely on a social stigma associated with A.H.'s disability. Rather, it specifically referred to A.H.'s "bizarre conduct," (emphasis added), and "extremely destructive action[s]." It held that this "significant disturbance in A.H.'s overall cognitive and emotional functioning" constituted a substantial change in circumstances. Therefore, the court examined the best interests of the child, and held that A.H.'s behavior and condition were detrimental to C.P., and that she was unreliable and unable to care for him. While the court did indicate that C.P. might be embarrassed by his mother, the reference came in discussing A.H.'s "conduct" and not any stigma associated with her impairment. The trial court did not improperly rely on any social stigma related to A.H.'s condition in awarding custody to W.P.

C. The Court's Order Mandating that A.H. Pay Child Support

A child support award
will be reversed "only if this court has a definite and firm conviction based on the record as a whole that a mistake has been made or the trial court abused its discretion."
Money v. Money, 852 P.2d 1158, 1164 (Alaska 1993) (quoting Hunt v. Hunt, 698 P.2d 1168, 1172 (Alaska 1985)).
We glean from W.P.'s brief that child support was based on a master's finding that A.H. was capable of earning $1,500 per month, a figure approximating A.H.'s earning capacity before she fled the state with C.P. in September 1992.[5] In December 1992 the superior court issued an interim order that A.H. pay $300 per month in child support in accordance with Civil Rule 90.3. This order was issued while A.H.'s and C.P.'s whereabouts were unknown during their second flight from the state. After A.H. and C.P. were located and returned to Alaska, the superior court ordered that W.P. receive permanent custody and that the $300 monthly child support payment be ongoing.
However, between these orders the superior court gave significant attention to the impairment in A.H.'s mental functioning. It was this disability that was the basis for the superior court's modification of custody. W.P.'s own allegations indicate that A.H.'s condition had resulted in her loss of "numerous jobs" and difficulty in maintaining amicable relationships with employers. The trial court characterized A.H. as a person suffering from a mental impairment who is "paranoid," not "reliable," and is "not in touch with reality." It is difficult to conceive that such an individual is capable of commanding the level of salary the trial court imputed.
Therefore, we conclude that the trial court was mistaken in reaffirming the child support award based on A.H.'s ability to earn $1,500 monthly. The trial court's award constitutes an abuse of discretion. Continuance of the child support in this amount in light of A.H.'s condition also apparently violates the spirit of the commentary to Alaska Civil Rule 90.3: "A determination of potential income may not be made for a parent who is physically or mentally incapacitated... ." Alaska R.Civ.P. 90.3 cmt. III.C.
The superior court's child support order is vacated. The issue is remanded for determination of an appropriate amount of child support, given A.H.'s present mental disability and a realistic assessment of her earning capacity with her disability.[6]

IV. CONCLUSION

The trial court properly found that a substantial change in circumstances justified reconsideration *246 of C.P.'s best interests. Furthermore, review of the trial court's evaluation process reveals no clearly erroneous factual findings or abuse of discretion in the custody modification proceeding. Therefore the superior court's holding on this issue is AFFIRMED.
The superior court did abuse its discretion in ordering A.H. to pay $300 monthly in child support. This issue is REVERSED and REMANDED for recalculation of child support consistent with this opinion.
NOTES
[1] A.H. provides an explanation for this contention. She explains that she "called the troopers to report what I felt was a bottle of juice that someone had opened or tampered with like the [T]ylenol poisening [sic] case." She further relates that the trooper located miscarriage tissue in the refrigerator, where she had stored it so that medical professionals could later examine it to determine whether A.H. would require certain medical treatment. In support of this contention, A.H. offers a medical report from Alaska Women's Health Services advising her to retain passed miscarriage tissue for such a purpose. A.H. also asserts that the tissue came to the attention of the officer because the Girdwood fire chief informed the trooper of its existence. A.H. maintains this occurred because the fire chief is Catholic, and A.H. is pro-choice.
[2] A.H. remained incarcerated pending trial on a felony offense as a result of taking C.P. out of the state.
[3] In these sections of her brief, A.H. essentially makes an overall argument that considerations regarding C.P.'s best interests weigh more heavily in her favor. With the exception of the substantive argument addressed in this section, she does not assert that the court abused its discretion by considering improper factors, failing to consider statutorily mandated factors, or improperly weighing certain factors in making its determination. Likewise, A.H. does not otherwise contend that the trial court made factual findings that are clearly erroneous. See McClain v. McClain, 716 P.2d 381, 384 (Alaska 1986).
[4] A.H. continually refers to her "handicap," but does not define it in her briefs. Based on the trial court's concluding statements, it appears that she alleged that her difficulties were due to a brain injury and not a mental illness. The court reasoned that regardless of whether her actions were due to one cause or the other, a change of custody was appropriate.
[5] The master's report was not included in the record, but in W.P.'s Motion for Interim Child Support and Supervised Visitation Costs he requested that a child support award be granted based upon A.H.'s salary as a bookkeeper before she fled Alaska with C.P. in September 1992.
[6] To support her contention that she is not capable of earning $1,500 per month, A.H. offers a July 1993 letter from Oklahoma's Social Security Administration indicating that she is entitled to disability benefits. While she did not offer this correspondence to the trial court, it should be considered upon remand.